Filed 2/22/22  Ross v. County of Madera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANITA ROSS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF MADERA,<br><br>    Defendant and Appellant. | F079038<br><br>(Super. Ct. No. MCV072774)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

It is hereby ordered that the nonpublished opinion filed herein on January 27, 2022, be modified as follows:

1.  On page 38, the first and second full sentences in the first partial paragraph are deleted and replaced with the following sentences:

> The trial court noted the statement that Ross "brought the lawsuit as soon as she could" was outside the record and it was clear she could have brought the lawsuit earlier, although it did not think it rose to the level "of doing anything with the jury at this point."  When the trial court noted it did not hear "any request for that," the County's attorney responded that was correct as it would only compound the problems.

2.  On page 43, the third sentence in the first full paragraph is deleted and replaced with the following sentence:

> Ross further asserts she was forced to take an unpaid leave from June 2007 to February 2008, which was an adverse employment action as a matter of law.

Except for the modifications set forth, the opinion previously filed remains unchanged.  This modification does not effect a change in the judgment.

Appellant Ross's petition for rehearing filed on February 15, 2022, is denied.


DE SANTOS, J.

WE CONCUR:


SMITH, ACTING P. J.


SNAUFFER, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANITA ROSS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF MADERA,<br><br>Defendant and Appellant. | F079038<br><br>(Super. Ct. No. MCV072774)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Madera County. James E. Oakley, Judge.

LTL Attorneys, Caleb H. Liang, Julia Levitskaia, and David M. Grimes for Plaintiff and Appellant.

Sagaser, Watkins & Wieland, Howard A. Sagaser, Ian B. Wieland, Amanda Kjar Miller, David G. Litman, and Michael J. Conway II for Defendant and Appellant.

-ooOoo-

A jury found in favor of plaintiff Anita Ross and against her former employer, defendant County of Madera (County), for violations of the California Fair Employment and Housing Act (FEHA), arising from retaliation and failure to prevent retaliation. The jury awarded Ross a total of $2 million in economic and noneconomic damages. The

County moved for judgment notwithstanding the verdict (JNOV) and a new trial. While the trial court denied the motion for JNOV, it partially granted the new trial motion. The trial court found four incidents of attorney misconduct and an instructional error, the cumulative effect of which prevented the County from having a fair trial, and the damages awarded were excessive.

Ross appeals from the order granting the new trial, while the County cross-appeals from the order denying its motion for JNOV. In Ross's appeal, we conclude the trial court did not abuse its discretion when it granted the new trial motion based on misconduct and instructional error. In the County's cross-appeal, we conclude the trial court did not err in rejecting the County's contention the doctrine of laches bars Ross's lawsuit. Accordingly, we affirm the trial court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Facts Giving Rise to Ross's Complaint

Ross, who holds a master's degree in social work, started working for the County's Department of Social Services (department) as a social worker in November 2002. She was hired as a "Social Worker IV," which requires a master's degree and is the highest nonsupervisory social worker position. Ross was required to type case narratives and case plans for children brought into custody and to handwrite her interactions with inmates she worked with at the prison in Chowchilla. In the summer of 2004, she was diagnosed with de Quervain's tenosynovitis, a wrist injury that caused her thumb and fingers to "lock down" and required her to take a year off work for treatment and recovery.

When Ross returned to work in the summer of 2005, she was limited in the amount of typing and writing she could do. The County accommodated these restrictions by granting her less typing-intensive assignments and providing her with a dictation device to record client contact narratives which an office assistant would transcribe. Ross became permanent and stationary in March 2006 and her restrictions were lightened so

2.

she could write and type longer—specifically, her writing and data entry each were restricted to 15 minutes per 30-minute period. Ross discussed her accommodations with her supervisors, and it was agreed Ross could be assigned some cases with the use of a dictation device to record contacts, which an office assistant would type into the system.

## A. *Ross is Passed Over for the Foster Parent Liaison Position*

Ross wanted to be assigned a special project, which she believed would entail little to no handwriting or data entry, in the hope of moving up to management and supervision. Around this time, a special project that consisted of working with minors aging out of the foster care system opened. Ross claimed she told Lutz, who was her program manager, she was interested in a special project to better utilize her skills and experience, and to move away from computer work. Another employee, however, was appointed to the position without the job opening being announced and without Ross being given the opportunity to apply. Ross testified she told Lutz she would have liked the opportunity to compete for the position and she did not think the employee who was appointed was qualified for the position.

After this, Lutz announced an opening for a foster parent resource liaison position, which involved recruiting potential foster parents through community events. Ross, who had been a foster parent, believed the position was a good fit because of her training to become a foster parent and a certification she received at the County to teach foster parent training classes. Ross applied for the position and interviewed with Lutz. Afterwards, Ross was "very confident" she would receive the position as Lutz told her the interview went very well and she answered all the questions correctly. The position, however, was given to another employee, Janie Leal.

Susan Arteaga, who was a deputy director of the department at the time of these events, explained at trial the foster parent liaison position was not intended for a Social Worker IV, as the Social Worker IV's education level made them more appropriately utilized with complex children and families and their skill set was unnecessary for the

3.

foster parent liaison's responsibilities. Leal was below a Social Worker IV. In addition, Lutz, who along with program manager Fern Mills, selected Leal for the position, testified Leal was selected because she had the characteristics that were needed for the position. According to Lutz, special assignments do not result in a promotion or pay raise, and do not involve supervising staff or managing a budget.

Upon learning she did not receive the position, Ross told Lutz she could not understand how she could be denied the position after being made to go through an interview process and answer all the questions and asked if it was because she was African American. According to Ross, at that time no African American had received a special project.

**B.** ***Ross is Moved to the Permanent Placement Unit***

The same day, July 31, 2006, Ross's supervisor, Raye Hoevertsz, asked Ross to immediately move to the permanent placement unit. Ross was upset because she was not given the usual two weeks to transition to the new unit. Ross testified that when she resisted the move, Hoevertsz reminded Ross she had to do her performance evaluation. Ross felt threatened, believing Hoevertsz would give her a negative evaluation if she did not move. Ross's computer and phone were moved to the new unit on August 4, 2006. Ross, however, stayed at her old desk, without a computer or phone, until she moved to the new unit on August 9.

Meanwhile, on August 1, 2006, social worker Otilia Zaragoza wrote incident reports at Hoevertsz's request regarding Ross's handling of two home visits Ross conducted in late June and early July on Zaragoza's cases. Two days later, Hoevertsz issued an interoffice memorandum to Ross based on the two incidents explaining the proper protocol when an allegation of abuse arises during a home visit, which Ross believed was a "write-up." Ross claimed when she presented documents to Hoevertsz and Lutz that showed she followed the proper protocol, Hoevertsz told her the memorandum would not go into her personnel folder. Ross testified she had not been

4.

written up like this before, she had never seen a social worker draft a report about another social worker's performance and she had never seen a write-up that concerned incidents that occurred nearly a month or more earlier. Zaragoza testified this was the only time she had ever been asked to write a report concerning another social worker's performance.

Hoevertsz, however, testified that while the accusations were serious, the memorandum was not a form of discipline, but rather was a reminder that went into a folder that supervisors kept in their offices. Adrienne Calip, the County's deputy county administrative officer overseeing human resources, also testified the memorandum was not formal discipline or a written reprimand, and it would not have gone into Ross's official personnel file.

On August 7, 2006, Mills told Ross her coworker, Natina Brown,[1] who is African American, was a "troublemaker." Ross responded that Mills had said the same about her. Ten days later, Ross went to the administration building to get a reimbursement check and the person who handed her the check asked "what type of trouble" she was starting.

According to Brown, a social worker supervisor who worked in the same area as Ross, she and other supervisors were concerned about Ross's transfer to the permanent placement unit because the caseload is higher and involves more typing. In addition, Ross was taking over a full Spanish-speaking caseload, but Ross did not speak Spanish. Arteaga agreed the permanent placement unit has the highest caseload and if Ross were assigned a full caseload there, she could be required to work beyond her restrictions. Arteaga testified the foster parent liaison position did not have an assigned caseload and admitted it potentially required less typing and handwriting than a case-carrying social worker. Lutz agreed the permanent placement unit had a higher caseload count than

---

[1]     At the time of these events, Natina Brown was known as Natina Smith.

other units but explained the work level was the same as there were fewer people to contact. Ross conceded a normal caseload varied depending on the unit.

Ross claimed she told Lutz on August 18, 2006, that she was concerned about her ability to manage her caseload given her hand disability, but Lutz told her she should be able to manage it and that Arteaga said she had to, as she would have the same caseload as other social workers. Ross further claimed she was issued a dictation device that day, but an office assistant was not made available to her to do the transcribing, so she did it herself. Ross also said she told Lutz she did not have an office assistant to transcribe, but Lutz responded she would just have to manage on her own. Ross, however, never filed a written complaint about Lutz not allowing people to transcribe her work.

Ross hurt her hand again on September 3, 2006, when her left thumb locked down into the palm of her hand. Ross attributed it to overextending herself while working on a court report. Ross claimed she showed the injury to her supervisor, Michelle Hansen, who told her to shake it off and finish the report.

## C.    *The Incident Involving Ross's Performance Evaluation*

On September 6, 2006, when Ross asked Hoevertsz about her performance evaluation, Hoevertsz said she sent it to administration for approval. According to Hoevertsz, Ross became angry and put her hand hard on Hoevertsz's desk; Hoevertsz felt bullied and tried to diffuse the situation. Ross, who was concerned about not having an opportunity to review the evaluation first, could not find the evaluation at administration and believed Hoevertsz was playing games with her.

Ross asked Lutz about the evaluation eight days later and saw the evaluation on Lutz's desk. Lutz and Ross went to Hoevertsz's office to ask her about it; Hoevertsz apologized for telling Ross the evaluation was at administration. Ross accepted the apology and was ready to leave when Hoevertsz claimed Ross was harassing her. Ross felt uncomfortable and wanted to leave the office they were in, but according to Ross, Lutz ordered her to remain there as she wanted the two of them to work the matter out.

6.

Ross, who asked for a union representative, managed to leave the office and return with Brown, who moved to suspend the meeting because Ross was being forced to defend herself. Lutz did not understand why Ross was so angry as they had resolved the location of the evaluation; Lutz, who thought the situation was blown out of proportion, believed they needed to discuss why Ross felt she had to complain to her about something she should have resolved with Hoevertsz.

The evaluation, which was given to Ross on September 18, 2006, showed Hoevertsz rated Ross as competent in all areas.

### D. *Ross Files an EEOC Complaint*

Ross filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the California Department of Fair Employment and Housing (DFEH) on September 29, 2006, which the County received notice of that day. The charge alleged, among other things, that in retaliation for complaining about racial discrimination, Ross was denied (1) promotion opportunities, (2) the foster parent liaison position, and (3) accommodations for her disability. The subsequent EEOC and DFEH proceedings are detailed below (see, *infra*, part II.B.). While Ross received a right to sue letter from the DFEH in October 2006, which stated it closed its case because the EEOC was investigating the charge, Ross did not receive a right to sue letter from the EEOC until July 2016.

Arteaga, who the EEOC interviewed in response to the 2006 complaint, was personally offended by the EEOC complaint—she thought it defamed her and was the worst insult anyone could lay at her feet. Lutz felt bullied by Ross and that Ross was watching to see if she did something wrong.

### E. *Ross Engages in the Interactive Process*

In October, November, and December 2006, Ross met with Terry Hurt from human resources to engage in the interactive process to determine a reasonable accommodation for her disability. During these meetings, Ross admitted she was unable

7.

to manage her caseload and she was working outside her restrictions. Ross did not tell Hurt anyone was refusing to transcribe her materials, although she claimed her supervisor, Arteaga, and Lutz all knew about it.

### F. *Ross is Investigated and Takes Medical Leave*

In January 2007, Ross discovered she was the subject of an investigation into a complaint lodged by social worker Felicia Riley, who is African American, that Ross used a racial slur when referring to Riley. An outside attorney investigated the complaint. He interviewed Ross, who denied making the statement. It appeared to Ross that Riley did not write the complaint because it was written in the third person. Hoevertsz, however, testified Riley came into her office complaining about the incident. Hoevertsz said she took the matter to Mills and she understood Riley filed a written complaint about the incident. Hoevertsz denied being involved with helping Riley draft the complaint. The County advised Ross in March 2007 that based on the investigation, it was "determined that there was insufficient evidence regarding the complaint." Calip confirmed the County has an obligation to investigate verbal and written complaints regarding retaliation, discrimination, and harassment.

Soon after the investigator interviewed her in January, Ross had a panic attack and took a medical leave of absence. She began treatment with psychologist Dr. Dennis Lewis. She was diagnosed with acute stress and fell into a depression.

In February 2007, the County advised Ross that based on her January 2007 handwriting and data entry restrictions, it could not find an appropriate work assignment for her and did not believe she could perform the duties of her position. Ross was confused because the County had previously accommodated restrictions which were more limited than the new ones. After this, Ross continued to treat with Dr. Lewis.

Ross was prepared to return to work on temporary modified duty in June 2007; Dr. Lewis cleared her to work 20 hours per week and in March 2007, her hand doctor determined she was permanent and stationary and could return to her prior handwriting

and typing restrictions. Ross claimed Hurt told her she could not return to work until all her restrictions were gone. In late June 2007, the County sent Ross a letter stating Dr. Lewis's fitness for duty certificate referred to the January 2007 restrictions, which precluded her return to work, and advised her to provide written documentation when her restrictions were modified. Dr. Lewis's medical records for Ross showed he had taken Ross completely off work for most of 2007.

Ross again attempted to return to work in January 2008, when Dr. Lewis cleared her to return full time. At first the County advised Ross it was unable to return her to work unless there was a change in her medical restrictions, but after engaging in an interactive process with Ross and Ross applied for unemployment, the County agreed she could return to her position with the accommodations of a voice activated recording device and use of office staff to transcribe her tapes and handwritten notes.

## G. *Ross is Passed Over for a Supervisory Position*

Ross interviewed for a supervisory position in the summer of 2009. On July 3, 2009, before Ross learned whether she got the position, Lutz told a story at a workplace lunch which she ended by imitating the accent of an individual she identified as being southeast Asian. A week later, Ross filed a written grievance about the incident.

Three days later, on July 13, 2009, an email was sent to all staff with an attached announcement that Cynthia Suarez was promoted to the supervisory position Ross interviewed for. Ross believed she was the most qualified candidate for the position because she had been selected to act as an interim supervisor a few months earlier and performed "really well," and it was rare for interim supervisors not to be promoted to a permanent supervisor when the opportunity arose. While Suarez had not been an interim supervisor, she had prior supervisory experience and was a licensed clinician in another state who was in the process of getting a California license, which, according to Arteaga, conferred higher standing than a master's degree. Lutz, who was on the interview panel,

testified Suarez was selected for the position because she had the qualities and characteristics needed for the position.

In March 2010, Ross received a performance evaluation from Suarez, who was her supervisor, but Ross refused to sign it. The evaluation, which marked Ross as competent in every category, stated Ross's case plan compliance rate of 80.7 percent had been discussed with her and it was expected the rate would improve over the next review period. Ross claimed she was not at fault for the case plan compliance issue, as she had completed the case plans, but Hoevertsz left them in her desk when she separated from the County, leaving Lutz responsible for them.

## H. *The Intended Notice of Discipline*

In August 2010, Ross was served with a subpoena from the County's district attorney's office to appear for an interview regarding an investigation involving a department coworker. Ross, who was "kind of afraid" because she had never been subpoenaed before, asked then-department Director Kelly Woodard if she could bring a legal representative to the interview. Ross claimed Woodard called county counsel and asked if she could discipline Ross if she did not participate in the investigation. Because Ross could not secure a legal representative on such short notice, she brought an acquaintance with her who had experience negotiating contracts with the County, but the investigator refused to meet with them because the acquaintance was not an attorney. Ross claimed she tried to contact Woodard for guidance on how to proceed, but Woodard refused to meet with her. Ross was served with a notice of intended order of discipline on September 21, 2010.

Ross attended a meeting on October 4, 2010, regarding the intended order of discipline; she was given a proposed order of disciplinary action indicating the County was considering issuing a three-day suspension for insubordination. The County, however, declined to issue the suspension after Ross explained why she did not comply with the subpoena.

10.

After Ross was served with the notice of intended order of discipline, she suffered a panic attack, took medical leave, and did not return to work. In February 2012, the County asked Ross to apply for a disability retirement. Ross submitted the retirement paperwork and was examined by Dr. Thomas Callahan in February 2013 so CalPERS could assess her ability to work. Dr. Callahan diagnosed Ross with major depression and occupational stress, and concluded she was substantially permanently incapacitated from the performance of her usual duties. As a result, Ross received a permanent disability retirement, which was effective April 24, 2012.

## II.    Ross's Claims Before the Jury and the Special Verdict

In August 2016, Ross filed a complaint against the County, which included the following causes of action: (1) race discrimination in violation of title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et. seq.; title VII) and the Fair Employment and Housing Act (Gov. Code, § 12940; FEHA); (2) disability discrimination in violation of title I of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) and FEHA; (3) claims under FEHA for failure to accommodate, failure to engage in the interactive process, harassment, retaliation for opposing discrimination and harassment, and failure to prevent discrimination, harassment, and retaliation; and (4) declaratory relief. Ross sought economic damages, including lost past and future earnings and benefits, and noneconomic damages, including severe emotional distress and emotional and mental anguish.

Ross named two of the County's managerial employees, Susan Arteaga and Donna Lutz, as individual defendants, alleging only the harassment cause of action against them. Arteaga and Lutz, represented by the County's law firm, demurred to the harassment cause of action on the ground they were protected from personal liability by the doctrine of managerial immunity. The trial court sustained the demurrer with leave to amend. In her first amended complaint, Ross named only Lutz as an individual defendant in her harassment claim. Lutz again demurred to the harassment claim on the same ground.

11.

The trial court sustained the demurrer without leave to amend and dismissed Lutz from the case.

In July 2018, the trial court granted Ross's motion to file a second amended complaint, which added an eleventh cause of action for constructive discharge in violation of public policy.

A nearly five-week jury trial commenced in October 2018 and concluded the following month. During trial, the parties stipulated to dismissing Ross's claims for racial and disability discrimination in exchange for waivers of costs. Thus, the only claims before the jury were those under FEHA for failure to accommodate, failure to engage in the interactive process, harassment, retaliation, and failure to prevent discrimination, harassment, and retaliation.

The jury returned a special verdict finding in Ross's favor only on her claims for retaliation and failure to prevent harassment, discrimination, or retaliation. The jury found the County was not liable on Ross's remaining claims for failure to accommodate Ross's disability, failure to engage in the interactive process, hostile work environment harassment, and constructive discharge in violation of public policy. The jury awarded Ross damages totaling $2 million, comprised of $750,000 for past economic loss, $250,000 for future economic loss, $750,000 for past noneconomic loss, and $250,000 for future noneconomic loss.

## III.    The Motions for JNOV and New Trial

The County moved for JNOV and a new trial. As pertinent here, the County argued it was entitled to JNOV because laches barred the case, as Ross's delay in filing this lawsuit was unreasonable and it was prejudiced by the delay. With respect to the new trial motion, the County asserted numerous grounds for granting a new trial, including prejudicial attorney misconduct, giving an improper jury instruction, and excessive damages.

12.

Following oral argument on the motions, the trial court denied the motion for JNOV, but granted the motion for new trial on some, but not all, of the stated grounds. The trial court issued an order granting the motion for new trial and specification of reasons (the Specification), which stated the motion was granted on the following grounds: (1) irregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial, based on attorney misconduct and giving an improper instruction (Code Civ. Proc.,[2] § 657, subd. 1); (2) excessive economic and noneconomic damages (§ 657, subd. 5); and (3) error in law, occurring at the trial and excepted to by the party making the application, based on the improper instruction (§ 657, subd. 7). The trial court set aside the judgment, vacated the special verdict, and ordered a new trial on all issues.

## DISCUSSION

### I. Ross's Appeal

Ross appeals from the order granting a new trial and argues the trial court erred in granting a new trial based on attorney misconduct, instructional error, and excessive damages.

A trial court may vacate a verdict, in whole or in part, and grant a new trial for any of the grounds listed in section 657 "materially affecting the substantial rights of a party," including, as pertinent here: (1) "Irregularity in the proceedings of the court, jury or adverse party … by which either party was prevented from having a fair trial"; (2) "Excessive or inadequate damages"; and (3) "Error in law, occurring at the trial and excepted to by the party making the application." (§ 657, subds. 1, 5 & 7.)

When the trial court grants a new trial motion, it is required to specify both the grounds upon which the motion is granted and its reasons for granting the motion on each of those grounds. (§ 657; see *Bell v. Bayerische Motoren Werke Aktiengesellschaft*

---

[2] Undesignated statutory references are to the Code of Civil Procedure.

13.

(2010) 181 Cal.App.4th 1108, 1121 (*Bell*).) "An order granting a new trial must be affirmed on appeal if a new trial 'should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons,' except that an order can be affirmed on the ground of insufficiency of the evidence to justify the verdict or excessive or inadequate damages only if such ground was stated in the order and can be affirmed on those grounds only for the reasons specified in the order or specification of reasons." (*Ibid.*)

Appellate courts grant a high degree of deference to the determination to grant a motion for a new trial, as the trial court in ruling on the motion sits as an independent trier of fact. (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412.) Thus, a trial court's factual determinations, reflected in its decision to order the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations. (*Ibid.*)

Indeed, an order granting "a new trial rests so completely within the discretion of the trial court that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Brandelius v. City & County of San Francisco* (1957) 47 Cal.2d 729, 733 (*Brandelius*).) All presumptions are indulged in support of the order granting a new trial, and the appellate court will affirm so long as the order can be sustained on any ground, even if "the reviewing court might have ruled differently in the first instance." (*Id.* at pp. 733–734; see *Maher v. Saad* (2000) 82 Cal.App.4th 1317, 1323.) In essence, an order granting a new trial must be sustained on appeal unless the opposing party can demonstrate that no reasonable finder of fact could have found for the movant on the trial judge's theory. (See *Lane v. Hughes Aircraft Co.*, *supra*, 22 Cal.4th at p. 412.) "So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside." (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387.)

14.

Our review of the circumstances in the present case leads to the conclusion that the trial court's order granting a new trial was well within its broad discretion and must be affirmed.

## A. *The Absence of Affidavits*

The Specification cites five instances the trial court found constituted irregularities which had the cumulative effect of depriving the County of a fair trial. As Ross points out, the County only offered an affidavit as to one of these instances. While we address each of these instances below, we first must address, as a threshold matter, Ross's contention the incidents were not irregularities within the meaning of the statute because they were not raised by affidavit.

Section 658 provides that when an application for a new trial is made under section 657, subdivision (1), it must be made on affidavits.[3] Ordinarily, a motion for new trial under that subdivision cannot be granted if the motion is not supported by affidavits. (*Bakurjian v. Pugh* (1935) 4 Cal.App.2d 450, 452.) This is because " '[i]rregularity in the proceedings' (§ 657, subd. 1) 'is intended to refer to matters which appellant cannot fully present by exceptions taken during the progress of the trial, and which must therefore appear by affidavits.' " (*Gibbons v. Los Angeles Biltmore Hotel Co.* (1963) 217 Cal.App.2d 782, 791–792.)

However, an exception exists where the facts the party moving for a new trial relies on appear on the face of the record. (*Webber v. Webber* (1948) 33 Cal.2d 153, 163–164 (*Webber*).) In *Webber*, the plaintiff moved for a new trial in part under section 657, subdivision 1, asserting the trial court committed misconduct which deprived her of a fair trial. (*Webber*, at pp. 163–164.) Our Supreme Court rejected the defendant's contention the plaintiff could not urge this point on appeal because the new trial motion

---

[3] Section 658 provides: "When the application is made for a cause mentioned in the first, second, third and fourth subdivisions of Section 657, it must be made upon affidavits; otherwise it must be made on the minutes of the court."

was not supported by affidavits, reasoning: "It will be noted that section 658 … does not purport to require affidavits in all cases but only in support of those grounds specified in the first four subdivisions of section 657, which grounds can ordinarily be shown solely by facts which do not appear upon the face of the record. But where, as here, the party moving for a new trial under subdivision one of section 657 relies wholly upon facts appearing upon the face of the record, the reason for the rule requiring affidavits ceases and such rule should be held inapplicable [citation]. To hold otherwise would do violence to the principle that the law does not require idle acts." (*Webber*, *supra*, 33 Cal.2d at p. 164, citing Civ. Code, §§ 3510 & 3532;[4] see *Green v. Merced County* (1944) 62 Cal.App.2d 570, 571–572 [noting there is a recognized exception to the rule requiring affidavits when moving for a new trial on the ground of attorney misconduct since requiring affidavits where "the alleged misconduct fully appears from a reading of the reporter's transcript" would be unreasonable as they would "constitute a mere copy of those particular portions of the transcript"].)

"In view of the holding in *Webber*, the rule appears to be that affidavits are required in support of each of the first four grounds of section 657, unless, as to the particular ground specified, the party moving for a new trial relies solely upon facts appearing on the face of the record." (*Cembrook v. Sterling Drug Inc.* (1964) 231 Cal.App.2d 52, 67.)[5] Thus, "[u]nder some circumstances, the absence of a

---

**4**    In so holding, the court disapproved of language in two cases that indicated a contrary view, *Estate of Magerl* (1927) 201 Cal. 162, 168 and *Jennings v. Day* (1935) 7 Cal.App.2d 555, 558, explaining "such language is based upon a slavish adherence to the letter of the statute without consideration of the obvious reason and purpose thereof, resulting in an undue limitation upon the power of the trial court in passing upon a motion for new trial, and of the reviewing court on appeal." (*Webber*, *supra*, 33 Cal.2d at p. 164.)

**5**    In *Cembrook*, the appellate court held the trial court properly refused to admit oral testimony in support of a motion for new trial brought on the ground of irregularity in the proceedings. (*Cembrook v. Sterling Drug Inc.*, *supra*, 231 Cal.App.2d at pp. 65–67.) The appellate court explained it was "clear from the language of section 658 that where

16.

supporting affidavit is noncalamitous and other support appearing in the record may be accepted." (*McCown v. Spencer* (1970) 8 Cal.App.3d 216, 228.) Moreover, the failure to obtain affidavits does not deprive the court of jurisdiction to hear and determine the motion for a new trial. (*McConnell v. Superior Court* (1921) 51 Cal.App. 744, 745.)

Here, all the matters the trial court considered were available on the face of the record. The failure to provide affidavits did not deprive the court of jurisdiction to hear and decide the motion for a new trial, but rather was a "noncalamitous" omission. While Ross would have the availability of a new trial motion based on "irregularities in the proceedings" limited to matters the trial court could not have addressed at trial, such a limitation would render the trial court, as in cases where the defendant failed to object to attorney misconduct, " 'powerless to correct what might be an obvious miscarriage of justice.' " (*Seimon v. Southern Pacific Transportation Co.* (1977) 67 Cal.App.3d 600, 604–605 (*Seimon*).)[6] Accordingly, the trial court did not err in considering the County's grounds for the motion even if based solely on the record rather than affidavits.

the basis of the motion for a new trial is facts which can be shown solely by facts [outside] the record, the Legislature, insofar as the first four grounds of section 657 are concerned, intended to limit the showing solely to affidavits." (*Id*. at p. 67.) Our Supreme Court later affirmed the *Cembrook* decision, stating that, "[r]ecognizing the proceedings to be strictly statutory, the court held that when the motion is based on one of the first four grounds of section 657, and on facts outside the record, section 658 limits the presentation exclusively to affidavits." (*Linhart v. Nelson* (1976) 18 Cal.3d 641, 644.) The court went on to hold that a new trial motion brought on the first four grounds of section 657 cannot be based on oral testimony, but rather "must be presented solely by affidavit." (*Linhart*, *supra*, 18 Cal.3d at pp. 644–645.) The court, however, did not address the distinction noted in *Cembrook*, namely, whether a new trial motion may be based solely on matters stated *on* the record.

[6]      Ross asserts we should not follow *Webber* because the Supreme Court did not engage in a "serious analysis of the rationale for section 658" and the Supreme Court later made clear that courts may not eliminate an express statutory requirement under the guise of judicial construction, stating the Legislature's power in " 'specifying procedural steps for new trials is exclusive and unlimited,' " and a court " 'may not usurp the legislative function by substituting its own ideas for those expressed by the [L]egislature.' " (*Mercer v. Perez* (1968) 68 Cal.2d 104, 117–118.) Notably, *Mercer* did

17.

### B. *Attorney Misconduct*

A new trial may be granted where there is an "[i]rregularity in the proceedings" that deprived a party of a fair trial. (§ 657, subd. 1.) "No accurate classification of such irregularities can be made, but it is said that an overt act of the trial court, jury, or adverse party, violative of the right to a fair and impartial trial, amounting to misconduct, may be regarded as an irregularity." (*Gray v. Robinson* (1939) 33 Cal.App.2d 177, 182.) The statute's language "is sufficiently broad to include any departure by the court from the due and orderly method of disposition of an action by which the substantial rights of a party have been materially affected." (*Gay v. Torrance* (1904) 145 Cal. 144, 149.)

It is well settled that attorney misconduct is an irregularity in the proceedings upon which a grant of a new trial may be based. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870; *Bell*, *supra*, 181 Cal.App.4th at p. 1122.) Attorney misconduct may consist of: (1) pandering to the jury's prejudice, passion, or sympathy (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 295); (2) improper argument to the jury, such as by deliberately attempting to appeal to the jury's social and economic prejudices where that appeal is not relevant to the issues in the case (*Hoffman v. Brandt* (1966) 65 Cal.2d 549, 552–553 (*Hoffman*)), urging facts not justified by the record, or suggesting the jury may resort to speculation (*City of Los Angeles v. Decker*, at p. 870); and (3) "repeated violations of pretrial in limine rulings, despite sustained objections" (*Bigler-Engler v. Breg, Inc.*, at p. 295).

"Attorney misconduct can justify a new trial only if it is reasonably probable that the party moving for a new trial would have obtained a more favorable result absent the misconduct." (*Bell*, *supra*, 181 Cal.App.4th at p. 1122.) Even where the misconduct

---

not address the issue presented here, namely, whether a new trial motion brought under subdivision 1 of section 657 may be based solely on the record. Whether we agree with the Supreme Court's reasoning in *Webber* is irrelevant. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

does "not seem too serious from our vantage point, we give weight to the expressed opinion of the trial judge" that the misconduct "in fact resulted in a verdict of passion and prejudice." (*Seimon*, *supra*, 67 Cal.App.3d at p. 606.)

While in some circumstances the failure to object to attorney misconduct may constitute a waiver, the rules applicable to waiver, invited error, or estoppel do not apply when an appellate court is considering the propriety of an order granting a new trial. (*Malkasian v. Irwin* (1964) 61 Cal.2d 738, 747 (*Malkasian*); accord *Menasco v. Snyder* (1984) 157 Cal.App.3d 729, 734.) "Where the appeal is from an order granting a new trial and counsel for appellant has been guilty of misconduct, the fact that counsel for respondent has failed to take timely exception is not to be considered in determining whether the trial court has abused its discretion in granting the motion. [Citations.] 'To hold otherwise would mean that the trial court, by reason of the action of the parties, would be powerless to correct what might be an obvious miscarriage of justice.' [Citation.] Thus even though defendant technically may have waived his right to claim error with respect to opposing counsel's misconduct, that fact could not impair the power of the court to do justice by granting a new trial." (*Seimon*, *supra*, 67 Cal.App.3d at pp. 604–605.)

On review of each incident below, we cannot say the trial court erred in finding they constitute "irregularities" within the meaning of section 657, subdivision 1.

### 1.     Interjection of Ross's Faith

While Ross was testifying about what happened after she retired from the County, Ross's attorney[7] asked her: "Now, you're also a Christian; right?" Ross responded, "Yes." The County's attorney objected. After the trial court sustained the objection, an off-the-record bench conference was held. The trial court later explained in a conference

---

[7]     As the Specification does not distinguish between the two attorneys who represented Ross at trial, we will not do so.

19.

held outside the jury's presence it did not see any basis for going into a person's religious beliefs before a jury in any action, even if there were some arguable bases for it, and it presents "a 352 situation." The County's attorney moved for a mistrial, stating it was "so elementary that you do not interject religion in a trial" and asserted it was done only to prejudice the jury.

Ross's attorney stated the question was relevant to Ross's damages and emotional state. The trial court responded it would be a different situation if this were a religious discrimination or retaliation case, but it did not hear in any of the pretrial motions Ross's religion or the effect on her religious beliefs would be raised. The County's attorney confirmed this issue was never raised in depositions, discovery, or interrogatory answers. Ross's attorney, however, asserted faith came up during Ross's deposition, when she testified about using her religion and faith to cope with her depression, and the doctor who performed Ross's fitness-for-duty examination directly mentioned in his report that Ross coped with her negative emotions by talking with God and through prayer. The trial court stated it was going to strike Ross's answer and advised the jury it granted the motion to strike Ross's last answer and it was "to treat the answer as if it never was stated."

Brown and Dr. Lewis both made references to prayer during their testimonies: Brown stated she prayed with Ross before they went into the meeting with Lutz and Hoevertsz, and Dr. Lewis stated it was clear throughout Ross's work with him that she found relief in her faith and in prayer. The trial court noted, outside the jury's presence, there was an ongoing objection to bringing Ross's religion into the case. The trial court explained it tried to follow this rule: it sustained the objection and granted the motion to strike when Ross was asked if she was a Christian because it did not believe it was appropriate for a particular religion or denomination to be the subject of testimony, but it overruled the objections to Brown's and Dr. Lewis's references to prayer because it did not believe the answers were overly prejudicial and they had a psychological component.

20.

The County's attorney stated that while the court was well-intended, the jury's impression was much different than intended. The trial court agreed the jury's impression was permanently affected by the fact Ross was asked if she was a Christian, which was reinforced by the references to prayer.

In the Specification, the trial court explained it was "particularly troubling" that the question was deliberate and leading and came as a complete surprise to defense counsel and the court. While the trial court heard numerous motions in limine before jury selection started, Ross never brought this issue to the attention of the court and counsel. Since the County had no reason to anticipate Ross's particular faith would be an issue in this action, it did not have a reason to bring a motion in limine. When it denied the motion for mistrial, the trial court believed this single question and answer was insufficient by itself to justify ending the trial, but it now found "the interjection before the jury of [Ross]'s personal faith, when considered together with other irregularities which occurred later in the trial, resulted in the cumulative effect of the [County] being prevented from having a fair trial."

Ross contends the question about whether she is a Christian was not misconduct because her faith was relevant to her damages claim. She asserts the County knew before trial her faith was an issue because a fitness-for-duty evaluation stated Ross managed her negative emotions and stress "by talking with God, prayer," and she explained at her deposition that she chose not to take medication for her depression because of her faith. Ross further asserts her faith was relevant because the County's questioning at trial suggested her failure to take medication indicated the insincerity of her claim for emotional distress and the County could argue her refusal to take medication was a failure to mitigate damages. Ross claims her attorney intended to transition from this question to a discussion of the relationship between Ross's emotional distress and her faith, and her attorney never argued or even insinuated she was more credible because she is a Christian.

21.

The County responds the attorney's intentional interjection of Ross's Christian faith when her religion had nothing to do with her claims was misconduct. The County points out the evidence of religious belief "is inadmissible to attack or support the credibility of a witness" (Evid. Code, § 789), and asserts it is elementary an attorney does not interject religion into trial.

We agree with the County that Ross's religious affiliation was irrelevant to the issues in this case, and therefore asking her a leading question about it constituted misconduct. (*Hoffman*, *supra*, 65 Cal.2d at pp. 552–553 [arguing irrelevant matters that attempt to appeal to the jury's social and economic prejudices constitutes misconduct].) While we agree with Ross that her reliance on prayer and her faith in general was relevant to her emotional distress claim, as it showed how she dealt with her stress and why she declined to take medication, her religious affiliation was not relevant to her claims.

This case is not like the one Ross relies on, *People v. Baustista* (2008) 163 Cal.App.4th 762, where the defendant, a pastor of an independent Pentecostal church, was convicted of committing sex offenses involving two teenage girls who were his congregants. There, the religious beliefs and practices of the defendant and some witnesses provided context for the defendant's actions and the girls' delayed reporting of the incidents, and therefore were relevant to determining whether the defendant committed the alleged crimes. (*Id.* at pp. 784–785.) Here, although Ross's spiritual practices were relevant to her claims, her religious affiliation was not.

Ross contends the mention of her religion was not prejudicial because the question and answer were brief, and any harm was immediately cured by the trial court's admonition to the jury that, when it granted the motion to strike Ross's last answer, the jury was "to treat the answer as if it never was stated." Moreover, the jury was advised at the beginning and end of the trial that when the trial court grants a motion to strike, they "must totally disregard that testimony" and "treat it as though it did not exist." Finally,

22.

the jury was instructed not to be "biased against any witness because of his or her …
religion."  Ross argues the trial court was required to presume the jury followed these
instructions, citing *Tingley v. Times Mirror Co.* (1907) 151 Cal. 1, 23–24 and *Bell*, *supra*,
181 Cal.App.4th at pp. 1122–1123, and asserts the record shows the admonition was
effective.

We recognize, as stated in *Bell*, that "admonitions ordinarily are effective except
in cases of extreme misconduct" and "we presume that the jury followed the instructions
absent some indication to the contrary."  (*Bell*, *supra*, 181 Cal.App.4th at p. 1123.)  But
here, although the reference to Ross's Christian faith was brief and the jury was
admonished to disregard it, the trial court reasonably could conclude the subsequent
references during Dr. Lewis's testimony to Ross using faith and prayer to deal with her
emotional problems,[8] and Brown's testimony that she prayed with Ross, would have
confused the jury, since it was told to disregard that Ross was a Christian but then told
about her spiritual practices, and served only to remind the jury of her Christian faith.
The trial court consequently did not abuse its discretion in finding the jury was
permanently affected regardless of the admonition, and therefore prejudice resulted.

### 2. The Questioning of Donna Lutz

When Arteaga testified in Ross's case-in-chief, Ross's attorney asked several
questions about being offended when she received the EEOC complaint.  On cross-
examination, the County's attorney asked Arteaga, without objection, if she was

---

[8]    Ross's attorney read the contents of Dr. Lewis's reports that specifically dealt with
prayer during his testimony.  For example, Ross's attorney read a note from November
2007, which stated, among other things, that she was "letting go in prayer" and was
uncertain regarding what to do about her job, and then asked if she expressed indecision
about returning to work.  Later Ross's attorney read Dr. Lewis's report stating, "Wakes at
3 a.m. and prays … she's remaining positive with her reading and prayer" and then asked
if it seemed, in addition to her family support and the coping strategies he was teaching
her, whether "she also found relief in her faith and with prayer."  Dr. Lewis responded,
"Yes, that was clear throughout her work with me."

personally sued in this lawsuit. Arteaga responded: "I was, and that was set aside." The trial court, however, sustained Ross's attorney's objection to Arteaga being asked if she understood she was dismissed from the lawsuit "due to lack of merit." Following an unreported bench conference, the trial court struck the last question and answer.

When Lutz took the stand in the County's case, the County's attorney asked if Ross named her as an individual defendant in this lawsuit. After an unreported bench conference, the trial court sustained Ross's attorney's objection as to relevance and prejudice. The County's attorney asserted in his declaration in support of the new trial motion that the court and counsel discussed that the parties would not go into the fact that Lutz was previously a defendant in the case.

On cross-examination, Ross's attorney asked Lutz if she was represented by the County's attorneys. Lutz responded, "That's correct." Ross's attorney then asked why she felt the need for legal representation, to which Lutz answered, because "it's serious" and "it's important to have legal representation." The following exchange ensued:

"Q. You're not named in this case. You're not a defendant. Right?

"A. Not anymore.

"Q. Okay. And there's no claims being made against you, no causes of action, no actual lawsuits filed against you currently. Right?

"A. Not anymore, no.

"Q. And who's paying for your legal fees?

"A. I haven't received a bill yet.

"Q. How long have they represented you for? When did you first retain them?

"A. When I first received the subpoena—or whenever we first received the charges back …

"Q. How about—so I don't know when that happened. How about you just give me an idea, like an estimate as to time. How long have they been your lawyers for?

"A. They have been representing me since this case initially came.

"Q. You're saying back in 2016? They've been your lawyer since 2016?

"A. I believe that's correct.

"Q. You're saying you retained them for the past 2 years; is that right?

"A. Correct.

"Q. And you haven't received a single bill for services; is that right?

"A. That's correct.

"Q. The County is paying for your legal—your representation; isn't that right?

"A. That's correct.

"Q. So I just want to make sure I'm on the same page here—"

The County's attorney then asked to approach the bench, stating: "These are the questions I was trying to ask earlier."

During a discussion held outside the jury's presence, the trial court and parties discussed the problem with this line of questioning and the appropriate resolution. The trial court was surprised Ross's attorney went into this after the earlier bench discussion that the County's attorney would not go into the fact Lutz had been a defendant in the case, but Lutz gave a natural answer when asked if she was represented by the County's attorneys.

25.

The County's attorney asserted what Ross's attorney was doing was entirely unfair because Lutz was sued improperly and should not have been named in the first place, and she was entitled to a defense as a County employee under Labor Code section 2802. He believed the questioning led to the perception Lutz might be biased because taxpayer dollars were being used for her defense, and Ross's attorney should not have gone there based on their prior bench conference. The trial court noted it would have been appropriate to object earlier and they could have "just headed the whole thing off," adding that at this point, Lutz was asked several questions to which there was no objection, it was before the jury, and it was unsure what to do now.

Ross's attorney stated the purpose of his questioning was not to get into the fact Lutz had been previously named, but to ask how much time she spent preparing for the case and speaking with defense counsel, like he asked other witnesses. He was surprised Lutz said she was currently represented, which was why the line of questioning proceeded the way it did.

The County's attorney did not accept that explanation because Ross's attorney knew: (1) he named her as a defendant and an attorney-client relationship existed at one point; (2) a lay witness who is asked to give a legal conclusion as to who their attorney is would give that type of answer; (3) he could simply ask how long she met with the attorneys without violating attorney-client privilege; (4) under Labor Code section 2802, the County was obligated to provide the defense; and (5) once he got into that area, he was putting the County in a difficult position of having to object in front of the jury and look like they were trying to cover up something.

The trial court was not sure what was being asked of it and listed some possible solutions, including striking the testimony, which would legally be treated as if they had never heard it. Ross's attorney stated he did not understand what he was being accused of doing wrong. The trial court responded it did not think Ross's attorney could say it was appropriate for this matter to remain unanswered, and it would point out the

26.

sequence of events which Ross's attorney, upon reflection, would see it did not "seem right" that the "question and answer sequence" came out the way it did in front of the jury.

After further discussion about the problem and resolution, during which the County's attorney asserted Ross's attorney could have given them advanced warning of this area of inquiry and conceded they never formally dropped their representation of Lutz, Ross's attorney apologized for any confusion and stated it was not their intention to trick Lutz, but when someone answers the way they do, it raises questions. After continued discussion, the County's attorney suggested the court read the jury instruction regarding dismissed parties.

The following day, at the outset of the proceedings, the trial court told the jury: "You heard testimony yesterday that Donna Lutz had been named as a party in this case and was represented by [the County's attorneys]. Donna Lutz is no longer a party to this case. Do not speculate as to why Donna Lutz is no longer a party to this case. You should not consider this during your deliberations."

In the Specification, the trial court explained it was troubled that this line of questioning came as a complete surprise, and noted it commented at the time the questioning was unfair to the County and the parties should understand how bad it sounded before the jury.

Ross asserts her attorney's questions were proper because he was trying to determine whether Lutz had an attorney-client relationship with defense counsel that would prevent him from asking Lutz about her discussions with defense counsel in preparing her trial testimony. Ross states she did not have the opportunity to resolve whether Lutz was still represented by defense counsel before trial because Lutz was unavailable for deposition. Ross further asserts her attorney's questions regarding who was paying Lutz's legal fees and why she felt the need for representation were intended to explore whether the attorney-client privilege applied, as these questions were directly

27.

relevant to the reasonableness of Lutz's belief she was represented. Ross also claims that because Lutz was no longer a defendant, the County was not required to pay any legal fees accrued in preparing her to testify at trial and if the County paid them, Ross could impeach Lutz by arguing her testimony was prepared with the assistance of defense counsel and paid for by the County.

The County asserts the questioning constituted misconduct because Ross's attorney ignored the bench discussion "that the parties would not go into the fact that Ms. Lutz was previously a *defendant in this case*." The County's attorney stated in his declaration in support of the new trial motion that at the bench discussion "the Court and the parties' counsel discussed that the parties would not go into the fact that Ms. Lutz was previously a defendant in the case." The trial court, however, when discussing the County's objections to this line of questioning, stated on the record it was surprised Ross's attorney went into this "after the earlier discussion in which it was discussed at the bench that [the County's attorney] would not go into the fact … that she had [] previously been a defendant in the case." Ross asserts, based on the trial court's statement on the record, the prohibition against asking whether Lutz had been a defendant was directed only toward the County's attorney and we should reject his declaration as self-serving. The trial court, however, apparently found, despite its statement on the record, that the prohibition included both attorneys.

Even if the prohibition was directed only at the County's attorney, the questioning by Ross's attorney was improper as it ignored the bench discussion. When Lutz confirmed she was represented by defense counsel, rather than take the matter up with the trial court, Ross's attorney, knowing Lutz had been a named defendant who the County had represented, continued to ask questions about her need for representation, whether she was a defendant in the case and whether claims were being made against her. As the County points out, the questions about who was paying Lutz's legal fees, how long she had been represented by defense counsel, and that the County had been paying for her

28.

legal representation were focused, not as Ross asserts on who was paying Lutz's attorney fees to prepare her to testify at trial, but rather were general questions that reached back to the County's representation of her from the inception of the case, when it clearly was obligated to pay her fees under Labor Code section 2802.[9]  As such, they were improper areas of inquiry, as Ross's attorney questioned Lutz on matters not permitted by the trial court and improperly inferred bias to the jury.[10]

We agree with the County these series of questions were prejudicial as they insinuated to the jury that Lutz lacked credibility because she had been a defendant, she felt she needed representation, and she had not paid her legal fees or received a bill because the County was paying her fees.

Ross asserts this line of questioning could not be prejudicial because it was defense counsel who asked Lutz if Ross named her as an individual defendant and argued to the jury in closing argument that Arteaga and Lutz "were personally sued when they shouldn't have been," and the jury was admonished twice not to speculate why Lutz was no longer a party to, or involved in, the case.  The prejudice, however, arose from the questions apart from being named as a defendant, such as that she felt the need for

---

[9]     Labor Code section 2802, subdivision (a) provides:  "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful."  The statute requires the employer to defend an employee who is sued for conduct arising out of his or her employment. (*Jacobus v. Krambo Corp.* (2000) 78 Cal.App.4th 1096, 1100.)

[10]     Ross contends the County waived any claim of error by failing to timely object and invited the error by agreeing to admonish the jury regarding Lutz's status as a defendant.  But as we have explained, when an appellate court is considering the propriety of an order granting a new trial, waiver, invited error and estoppel are inapplicable.  (*Malkasian*, *supra*, 61 Cal.2d at p. 747; *Seimon*, *supra*, 67 Cal.App.3d at pp. 604–605.)

29.

continued representation and the County was paying her legal fees. Thus, the admonishment did not cure the error.

Finally, Ross asserts no prejudice accrued from these questions because the jury had ample cause to doubt Ross's credibility based on her testimony on cross-examination concerning the story she told in which she imitated the accent of an individual she identified as being southeast Asian, and at the time of trial she was seeking employment with the County. The County disputes that the reasons Ross asserts are supported by the record.[11] Regardless, the trial court believed the improper questioning already tainted the jury's perception of Lutz prior to any potential discrediting testimony elicited thereafter. The trial court did not abuse its discretion in finding the questions were prejudicial.

### 3. Natina Brown's Testimony

Ross wanted Brown, who filed an EEOC charge and lawsuit against the County, to testify as a "me too" witness, namely, that she experienced discrimination or harassment while working at the County. The County moved in limine to exclude Brown's testimony about her allegations on the ground she was not similarly situated to Ross. The trial court denied the motion, stating it would address the issue when it arose. It generally agreed the testimony would not be relevant if it concerned treatment by persons other than the supervisors in Ross's case, but if Brown "was retaliated against by the same supervisor for filing an EEOC complaint as alleged by Ms. Ross, then it would appear to me she would come in for that purpose."

---

[11]  For example, the record does not show Lutz was seeking employment at the County. While Lutz testified she had been looking for work since August 2018, she did not testify she was seeking employment at the County. Instead, the record shows Ross's attorney asked Lutz if she thought she would have a better chance of getting a job at the County if she did well testifying on the County's behalf. Lutz answered, "No."

When Ross's attorney called Brown as a witness, the County's attorney objected stating they needed to discuss the motion in limine. After a bench conference, the trial court overruled the objection. The trial court later stated Ross's attorney represented at the bench conference he would notify the trial court when he was going to go into "me too" testimony. After Ross's attorney elicited testimony from Brown on other issues, he asked to discuss the issue.

In a conference held outside the jury's presence, the trial court asked for an offer of proof as to the "me too" evidence and the foundation for its similarity to Ross's claims. Ross's attorney responded they established Brown and Ross were in the same department with the same managers and supervisors. The attorney stated Brown filed a charge with the EEOC in 2006, which outlined issues that paralleled those in Ross's case, including favoritism towards non-African American employees in terms of caseload, special projects and working out of class, creating division among African American employees, and Mills failing to take appropriate steps to address a racial slur a subordinate called Brown. The attorney added all these issues were outlined in Brown's EEOC pre-complaint questionnaire and reports to the EEOC. The attorney further stated after Brown filed her EEOC charge, retaliatory acts immediately occurred and explained what those were, including Lutz changing her work schedule, being a target of Riley's complaint, harassment by Mills and Lutz, Hoevertsz being promoted to the program manager position over Brown, and actions that surrounded Brown's separation from employment. Ross's attorney stated their intention was to stop before these latter actions and they were "just going to focus on the immediate aftermath of the EEOC complaint and the retaliation she suffers."

The attorneys agreed the County could ask Brown about her lawsuit against it, but not about the circumstances of her termination. As for the "me too" testimony, the County's attorney argued there was nothing in the offer of proof that was relevant to Ross's claims for retaliation and harassment, the evidence was not "me too" evidence,

31.

and even if admissible, the evidence should be excluded under Evidence Code section 352. The trial court, however, found the offer of proof sufficient, as it identified specific areas Brown would testify to concerning harassment or retaliation involving the same supervisors, namely, Mills and Lutz. The court added it would be receptive to valid objections made at the appropriate time.

Ross's attorney asked to clarify if Brown could testify about being called a racial slur, which was reported in her EEOC charge and which Mills did not address, which he said was relevant because Ross's case concerned an EEOC charge for race discrimination that resulted in retaliation. The trial court stated if Mills was the one who allegedly failed to respond appropriately, it would allow it.

When Brown's testimony resumed, Ross's attorney began to elicit the contents of Brown's EEOC complaint in detail and led Brown, who could not recall exactly what she reported to the EEOC, through each individual allegation using her EEOC pre-complaint questionnaire to refresh her memory. The allegations included favoritism towards non-African American employees, working out of class, being treated differently with respect to special projects, and efforts to divide African Americans. Brown gave narrative answers concerning many of the allegations and the attorney asked many follow up questions regarding the charges.

After the jury was excused during a break in testimony, the County's attorney expressed his concern that if they were just trying to show Brown filed a complaint and retaliatory actions occurred, they only needed to say there was an EEOC complaint and certain actions took place. The attorney complained there would now be a minitrial on each allegation raised in the EEOC complaint, which he did not understand to be the court's ruling. The trial court agreed, stating it was "very surprised with the detail" Brown went into, although it recognized that was "her speaking persona" and the way she responded to questions. The trial court also was surprised Brown needed to have her recollection refreshed for anything stated in the report and thought she would be better

32.

prepared. The trial court was unsure why the report's details, other than on a very summary level, would need to be given. The trial court asked Ross's attorney if he was anticipating that.

Ross's attorney thought it was just the way she responded, and he believed it was important to show the parallels with Brown's EEOC charge because the same type of complaints led to retaliatory actions. Ross's attorney said he could tell Brown to keep her answers shorter. The County's attorney was surprised because he thought they were just going to establish she filed the EEOC complaint, which the County would have stipulated to, and when Ross's attorney questioned Brown and purposely went into greater detail, that was contrary to everyone's understanding. The trial court was concerned with the detail, but it was not sure the testimony should be limited to just the fact she filed a complaint because they would not know what the complaint was. The County's attorney responded the complaint could have been summarized without going into detail; the trial court stated it thought that was going to happen, but it would leave it to Ross's attorney to direct Brown to keep her answers shorter.

Ross's attorney denied making a deliberate effort to try a case within a case; he thought he made a clear record of what they would get into and what in the EEOC charge they would talk about, but he would speak to Brown and not go into as much detail. When the County's attorney complained the damage had already been done, the trial court stated all it could do prospectively was to try to keep it shorter.

After the lunch break, before Brown's testimony resumed, there was further discussion about this issue. Ross's attorney asserted defense counsel's objection was belated and asked that they object sooner. The trial court responded that always was the preference, but the concern was not with the specific questions asked but rather the overall response given in long narratives. The County's attorney asserted Ross's attorney was putting an impossible burden on the defense by having to constantly object defeated the purpose of the motions in limine, and he again asked for a mistrial.

33.

In the Specification, the trial court stated Brown's testimony "went into details of her own complaints against the Department and went far beyond the bounds of what the Court had permitted the plaintiff." The trial court explained both it and counsel were taken by surprise by the depth and detail into which Brown described her complaints against the County, and she should have simply testified she filed the EEOC complaint and had been retaliated against in a similar manner. The trial court noted its comments at the time that it was very surprised at the details Brown testified to concerning her own complaints and experiences with the County, which were irrelevant to Ross's issues and highly prejudicial to the County.

Ross contends there was no misconduct because in its initial ruling on the motion in limine, the trial court stated it would allow testimony regarding the events that precipitated Brown's EEOC complaint. Ross further contends there was never a limiting instruction on Brown's testimony and the trial court made clear it was the County's responsibility to object when it felt her testimony went too far. Ross asserts her counsel examined Brown in the exact manner he declared he would within the boundaries the trial court established, and her testimony was relevant to Ross's retaliation claim because both Brown and Ross alleged race-based discrimination followed by similar retaliatory treatment. Ross asserts the fact Brown alleged she was retaliated against after complaining of racial discrimination was circumstantial evidence of Arteaga's retaliatory intent toward Ross.

The County contends Ross's attorney engaged in misconduct by exceeding the scope of Brown's testimony in violation of the trial court's limiting instructions. The County asserts, based on the extensive discussions about the admission of Brown's "me too" testimony and Ross's attorney's representation that he was "going to focus on the immediate aftermath of the EEOC complaint and the retaliation [Brown] suffer[ed]," the trial court and the County "were under the impression" Brown's testimony would consist of a summary of her EEOC complaint and the resulting retaliatory acts. Instead, Brown

34.

went into extensive detail about her complaints and Ross's attorney later admitted he intended to elicit these details because he believed it was important to show the parallels between Brown's and Ross's complaints.

We agree with the County. After hearing arguments concerning the admissibility of the "me too" evidence, the trial court permitted Brown's testimony for the purpose of proving similar acts of harassment or retaliation by the same supervisors who were the subject of Ross's claims, such as Mills and Lutz. The trial court did not state Brown could testify in detail about her racial discrimination claims that precipitated her EEOC complaint. Ross's attorney violated the trial court's limitation by eliciting testimony from Brown that went beyond it, and thereby committed misconduct.[12]

As for prejudice, the testimony brought to light allegations against the County that were not part of Ross's claims. Specifically, Brown testified about: (1) two white supervisors without master's degrees supervised workers with master's degrees in violation of protocol, while Brown, who had a master's degree, was given difficult workers with less education so she could fire them; (2) after being promoted to supervisor, Brown was required to keep working the cases she held as a case worker instead of them being distributed to other workers as was done for non-African American supervisors; (3) Brown was not allowed to assign work to a white subordinate who did not carry a caseload; (4) a special project Brown developed based on her work in Alabama did not receive a budget, while projects run by non-African American coworkers received budgets and staff; and (5) she felt the County was trying to divide African Americans because her supervisor told her Ross was a troublemaker and the

---

[12] Ross contends the County waived any objection to Brown's testimony, and invited any error, by waiting to object until the maximum prejudice accrued. As we have explained, when an appellate court is considering the propriety of an order granting a new trial, waiver, invited error and estoppel are inapplicable. (*Malkasian*, *supra*, 61 Cal.2d at p. 747.)

supervisor said the same thing to Ross and another African American coworker about her.

Since Ross dismissed her race discrimination claims, these incidents of alleged racial discrimination were irrelevant to Ross's claims and left the County to either defend against claims that were not before the trial court or jury or leave the jury with the impression the County regularly engages in discriminatory conduct. While Ross minimizes these incidents, arguing they are not inflammatory and therefore not prejudicial, her attorney asserted at trial the incidents were important to show parallels between the two cases. In that sense, they were inflammatory. Ross contends that Brown's claims of race-based discrimination were relevant circumstantial evidence of Arteaga's retaliatory intent, but it was not necessary to go into the details of Brown's claims to show she complained of racial discrimination. Moreover, Brown's testimony did little to prove the motive behind Ross's alleged harassment or retaliation. Accordingly, the trial court properly found the testimony prejudicial.

### 4.   The Closing Argument

In the County's closing argument, the County's attorney asserted its witnesses were credible and Ross's counsel "made a big issue" that some of them were unable to remember details from 10 to 14 years ago. The County's attorney argued it was not the County's fault some of the events went back to 2004 or 2006, as Ross was the one who decided to file the lawsuit, she had a right to sue letter in 2006,[13] and she could have filed this case anytime from 2006 to 2010, but she did not do so until 2016. The County's attorney further asserted Ross did not explain why she did not file the lawsuit earlier.

---

[13]    After Ross filed her initial EEOC complaint, she received a right to sue letter from the DFEH in October 2006, which stated it had closed its case because the EEOC was responsible for processing the complaint. The letter was not admitted into evidence at trial.

After the County's closing argument was completed, a discussion was held outside the jury's presence in which Ross's attorney objected to this argument as improper. The attorney asserted if the County could argue Ross should have filed the case sooner, she should be able to get into the fact she filed the lawsuit after receiving the EEOC's right to sue letter.[14]

The trial court noted the lawsuit could have been filed after Ross received the first right to sue letter, but it did not fault Ross for not filing then because the law encourages a party to try to resolve issues before going to court. The trial court further noted neither the statute of limitations nor laches was before the jury, although in ruling on a motion in limine on this issue, it said the parties were free to talk about how old the lawsuit was. Ross's attorney proposed being allowed to mention Ross was dealing with the EEOC until 2016. The County's attorney agreed Ross's attorney could state Ross was still dealing with the EEOC up until just before this case was filed, but it would go too far to state a right to sue letter was issued in 2016. The trial court questioned if the 2016 right to sue letter was in evidence but stated it would allow Ross's attorney to assert Ross "was working through the EEOC up until that time."

During rebuttal, Ross's attorney stated she wanted to address the comment that Ross did not bring this case sooner. The attorney asserted Ross filed several EEOC complaints throughout her employment and even after, and while they "would have wished to bring this lawsuit earlier, Ms. Ross was working with the EEOC until 2016, and that's when she filed her lawsuit, in August of 2016. So she did bring it as soon as she could."

Following the rebuttal, outside the jury's presence, the County's attorney objected to the rebuttal being improper on several grounds. As pertinent here, he asserted there

---

**14**    The EEOC did not issue a right to sue letter until July 2016; Ross filed this lawsuit the following month.

were "some misstatements" about the EEOC charges when it was represented "they brought the lawsuit as soon as she could," which was untrue and was not agreed to. The trial court noted the statement that Ross "brought the lawsuit as soon as she could" was outside the record and it was clear she could have brought the lawsuit earlier, although it did not think it rose to the level of doing anything with the jury. When the trial court noted it did not hear a request for that, the County's attorney responded that was correct, as it would only compound the problems.

In the Specification, the trial court stated it ruled Ross could argue she had been working with the EEOC until the time of the resolution of the last complaint, which made the present action timely, but it would not be proper to argue the present action was brought as soon as possible. The trial court stated that nevertheless, Ross's counsel argued Ross filed the present lawsuit "as soon as she could," and when the County objected the statement was false and beyond what the court allowed, it agreed. While the trial court recognized no trial is perfect, and it would not expect perfection from either counsel, it found the "misstatement of counsel" that Ross filed this lawsuit "as soon as she could" was an irregularity occurring during trial.

Ross first asserts improper argument to the jury cannot, as a matter of law, be an "irregularity" within the meaning of section 657, citing *Gibbons*, *supra*, 217 Cal.App.2d at p. 791. While the court in *Gibbons* does state arguments to the jury are not irregularities within the meaning of section 657, our Supreme Court has subsequently held closing arguments that are based on matters not supported by the evidence or appeal to the jury's sympathy and prejudice, constitute misconduct upon which a grant of a new trial may be based. (*Hoffman*, *supra*, 65 Cal.2d at pp. 552–553.) Therefore, we reject Ross's contention that misconduct during argument is not a proper ground for granting a new trial.

Ross argues her attorney's argument "comports perfectly" with the trial court's guidance, as the statement merely implies Ross filed the lawsuit " 'as soon as she could

38.

*after allowing the administrative efforts at conciliation to play out.*' " But that is not what her attorney stated. Instead, the attorney implied Ross could not have brought the lawsuit earlier because she was working with the EEOC, which was not true and was not supported by the evidence. Moreover, Ross's attorney violated the trial court's order to limit the argument to stating Ross was working with the EEOC up until just before this suit was filed. While Ross claims her attorney was merely curing the County's misleading suggestion that Ross's actions in bringing suit when she did were problematic or less than timely, her attorney still violated the trial court's order. In addition, the added statement was unnecessary to show the present action was timely, since the attorney was permitted to state, as she did, that they filed the lawsuit in 2016, after working with the EEOC.[15]

Ross contends no prejudice could result from her attorney's remark because the statement was de minimis. The statement, however, was false and harmed the credibility of the County's witnesses, who were unable to recall events when questioned by Ross's attorney, which left them looking like they were hiding something. The trial court reasonably could presume that by stating Ross brought the lawsuit "as soon as she could," the jury was misled and likely left to question why answers were not provided.

## C. *The Cat's Paw Jury Instruction*

The trial court found the improper inclusion of the cat's paw jury instruction was both an irregularity in the proceedings under section 657, subdivision 1 and an error in

---

[15] Ross also contends the County waived any objection to the statement by failing to raise it while a curative admonition could be issued. However, as we have explained, when an appellate court is considering the propriety of an order granting a new trial, waiver, invited error and estoppel are inapplicable. (*Malkasian*, *supra*, 61 Cal.2d at p. 747.) For this reason, Ross's reliance on *Horn v. Atchison, Topeka and Santa Fe Railway Co.* (1964) 61 Cal.2d 602, for the proposition that a party waives a claim of misconduct if the party fails to timely object and request that the jury be admonished, is misplaced, as there the court was reviewing the *denial* of a motion for a new trial. (*Id.* at p. 610.)

law under section 657, subdivision 7. It is well settled giving an erroneous instruction is an error of law under section 657, subdivision 7. (*Gonsalves v. Petaluma Building Materials Co.* (1960) 181 Cal.App.2d 320, 335–336.) Moreover, "[t]he grant of a new trial is a proper remedy for the giving of an erroneous jury instruction when the improper instruction materially affected the substantial rights of the aggrieved party." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 205.)

In assessing instructional error, we first determine whether there was error in giving the instruction. (*Brandelius*, *supra*, 47 Cal.2d at p. 734.) While we determine as a question of law whether the instruction was erroneous, once error is shown, we may not substitute our judgment for that of the trial court on the issue of prejudice. (*Treber v. Superior Court* (1968) 68 Cal.2d 128, 132.) "[T]he sole issue is whether the order granting a new trial, viewed in the light of the whole record, constituted a manifest abuse of discretion." (*Ibid.*) When a new trial is granted based on an erroneous instruction, " 'the order "will not be disturbed unless the questioned instruction was absolutely accurate and under no reasonable interpretation could possibly have misled or confused the jury." ' " (*Caldwell*, *supra*, 41 Cal.App.4th at p. 205; *Brandelius*, *supra*, 47 Cal.2d at pp. 745–746.)

Here, Ross proposed instructing the jury with CACI No. 2511, which is entitled "Adverse Action Made by Decision Maker Without Animus (Cat's Paw)." According to the directions for use, this instruction may be given if the "cat's paw" rule is a factor in the case, which applies when "the person who actually took the adverse employment action against the employee was not acting out of any improper animus," but "acted on information provided by another person who was acting out of discriminatory or retaliatory animus with the objective of causing the adverse employment action." (CACI No. 2511, Directions for Use.) Ross's attorney asserted this instruction was appropriate because there were nothing to show the heads of departments or directors engaged in

wrongful conduct, while Ross claimed supervisors and program managers engaged in wrongful conduct.

The instruction was given over the County's objection. As read to the jury, the jury was instructed: "In this case, the decision to take adverse employment action against Anita Ross was made by Hubert Walsh. Even if Hubert Walsh did not hold any retaliatory intent, the County of Madera may still be liable for retaliation if Anita Ross proves both of the following: One, that Anita Ross' protected activities or attributes were substantial motivating reasons for Terry Hurt, Kelly Woodard, Susan Arteaga, Donna Lutz, or Raye Hoevertsz's recommendations; and, two, that Terry Hurt, Kelly Woodard, Susan Arteaga, Donna Lutz, or Raye Hoevertsz's recommendations were substantial motivating reasons for Hubert Walsh's decision to take adverse employment action against Anita Ross."[16]

In the Specification, the trial court found the instruction as given was erroneous. The trial court explained the instruction was not proper as submitted to the jury because it assumed Hubert Walsh had taken an adverse employment action against Ross. Instead, the instruction should have stated the precise adverse action allegedly against Ross, and the jury would then decide whether any of these actions constituted an adverse employment action. As given, however, it declared to the jury that an adverse employment action had been taken against Ross and the director of the department, Hubert Walsh, had taken such action. The trial court found giving this erroneous instruction, along with the other irregularities, had the cumulative effect of preventing the County from having a fair trial.

We agree with the trial court that the instruction was erroneous because it assumed Walsh had taken an adverse employment action against Ross. The unmodified

---

[16]  In the written instruction in the clerk's transcript, the term "adverse employment action" as read to the jury is in the plural, i.e., "adverse employment actions."

41.

instruction, as stated in the Specification, provides: "In this case, the decision to [discharge/[*other adverse employment action*]] [*name of plaintiff*] was made by [*name of decision maker*]. Even if [*name of decision maker*] did not hold any [discriminatory/ retaliatory] intent [or was unaware of [*name of plaintiff*]'s conduct on which the claim of retaliation is based], [*name of defendant*] may still be liable for [discrimination/ retaliation] if [*name of plaintiff*] proves both of the following: [¶] 1. That [*name of plaintiff*]'s [*specify protected activity or attribute*] was a substantial motivating reason for [*name of supervisor*]'s [*specify acts of supervisor on which decision maker relied*]; and [¶] 2. That [*name of supervisor*]'s [*specify acts on which decision maker relied*] was a substantial motivating reason for [*name of decision maker*]'s decision to [discharge/ [*other adverse employment action*]] [*name of plaintiff*]."

Rather than list the specific adverse employment actions, Ross's protected activity or attributes, and the supervisors' acts on which Hubert Walsh relied, the instruction as given generally states: (1) "the decision to *take adverse employment actions* against Anita Ross was made by Hubert Walsh"; and (2) Ross must prove her "*protected activities or attributes* were substantial motivating reasons for Terry Hurt, Kelly Woodard, Susan Arteaga, Donna Lutz, or Raye Hoevertsz's *recommendations*" and their "*recommendations* were substantial motivating reasons for Hubert Walsh's decision to *take adverse employment actions* against Anita Ross." (Italics added.)

The phrase "the decision to take adverse employment actions against Anita Ross was made by Hubert Walsh" implies Walsh had in fact taken adverse employment actions against Ross, an issue that was for the jury to decide. The term "adverse employment actions" also made the instruction open-ended and confusing, as the jury also was instructed that Ross must prove she was subjected to an adverse employment action, which was defined for the jury, but then was told Walsh had decided to take adverse employment actions against Ross. The instruction also was open-ended and confusing because it did not specify Ross's protected activity or attribute, which was not

42.

defined for the jury, or identify the supervisors' acts on which Walsh relied, instead stating only that they made "recommendations." Thus, the instruction was erroneous because it was incorrect as modified, argumentative, and invaded the province of the jury by instructing on the facts. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 ["A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence."]; *Galway v. Guggolz* (1931) 117 Cal.App. 639, 641–642 [an instruction is erroneous where it is argumentative, instructs on the facts thereby invading the province of the jury, or is misleading].)

Ross argues the cat's paw instruction was not improper because "it merely stated an uncontroverted fact" that Walsh had authorized an adverse employment action against her. Ross asserts it was "conclusively established, as a matter of law, that Hubert Walsh *did* take an adverse employment action against [Ross] when he refused to allow her to return to work in 2007," as it was "not disputed" she "attempted to return to work but was disallowed." Ross further asserts she was forced to take an unpaid leave from January 2007 to February 2008, which was an adverse employment action as a matter of law. Ross claims that even if the phrasing was technically erroneous, given the litany of alleged adverse employment actions and that the occurrence of some of them was disputed, any instruction that included all of them would have been more prejudicial than the instruction that was given.

The County vigorously contests it was conclusively established that Walsh disallowed Ross from returning to work and that unpaid leave constitutes an adverse employment action. Even if these acts were conclusively established to be adverse employment actions, however, the instruction did not differentiate between those that Ross contends were undisputed and others that were disputed. As Ross concedes, the occurrence of some of the adverse employment actions was "hotly contested." Telling the jury that Walsh made the decision to "take adverse employment action against" Ross

43.

implies that all the incidents Ross claimed constituted adverse employment actions in fact were adverse employment actions. Therefore, the instruction was not accurate, as Ross contends.

This leaves whether the instruction likely misled or confused the jury. We will not disturb the trial court's "broad discretion" in granting a new trial on this basis even if it is only " 'fairly debatable' " that the instruction may have been misleading. (*Christian v. Bolls* (1970) 7 Cal.App.3d 408, 415.) Here, the cat's paw instruction likely could have misled the jury into assuming, without deciding the issue on its own, that an adverse employment action occurred and was taken by Walsh, and thereby find in Ross's favor on that element of her retaliation claim.

Ross contends the jury was not confused because it was given other instructions that stated she was required to prove this element, no attorney argued the jury should presume an adverse employment action had been taken, the special verdict form did not use the term "adverse employment action" but rather asked the jury whether the County engaged "in conduct that, taken as a whole, materially and adversely affected the terms and conditions of Anita Ross' employment," and the jury's "Yes" answer to this question was not unanimous, as one juror did not agree. Even if the jurors did not all agree, some still may have been confused by being told an adverse employment action had been taken. Given the conflicting instructions, it is at least fairly debatable that the cat's paw instruction was misleading. Accordingly, we cannot say the trial court abused its discretion in finding the erroneous cat's paw instruction was prejudicial.

### D. *Cumulative Error*

The trial court found that while neither the four instances of attorney misconduct nor the instructional error by themselves supported granting a new trial, when they were

44.

considered together, their cumulative effect prevented the County from having a fair trial.[17]

Under the "cumulative error" doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial. (*Delzell v. Day* (1950) 36 Cal.2d 349, 351 [while numerous improper comments by the trial judge did not justify reversal of the judgment when taken separately, "considering the entire record, it cannot reasonably be said that their cumulative effect did not prejudice the appellants' case"]; *Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174, 180 [concluding prejudice was apparent from the cumulative errors].) For example, the doctrine applies when there are numerous minor instances of attorney misconduct during trial that have a cumulatively prejudicial effect. (*Gackstetter v. Market Street Railway Co.* (1933) 130 Cal.App. 316, 325–327.)

The cumulative errors consist of: (1) identifying Ross as a Christian; (2) eliciting testimony from Lutz that she felt the need for legal representation and the County was paying her legal fees; (3) eliciting testimony from Brown that she experienced racial discrimination while working at the department; (4) commenting during closing argument

---

**17** Ross asserts because the trial court failed to explicitly state in the Specification that it found it was reasonably likely the County would have achieved a more favorable result but for the purported irregularities, the trial court failed to perform the analysis required of it under the state Constitution and find a miscarriage of justice. (Cal. Const., art. VI, § 13.) Ross asks us to either reverse the grant of new trial as an abuse of discretion or deem the Specification inadequate and exercise our own judgment to determine whether a new trial is legally required, citing *Thompson v. Friendly Hills Regional Medical Center* (1999) 71 Cal.App.4th 544, 550. A trial court, however, is not required to explain in its specification of reasons why it believed the irregularities or errors of law were prejudicial. (*Treber v. Superior Court*, *supra*, 68 Cal.2d at pp. 131–132.) Moreover, having granted a new trial, we presume the trial court considered the whole record and decided there was prejudicial error that resulted in a miscarriage of justice. (*McCarty v. Department of Transportation* (2008) 164 Cal.App.4th 955, 986; *Maher v. Saad*, *supra*, 82 Cal.App.4th at p. 1324; *Pitt v. Southern Pacific Co.* (1932) 121 Cal.App. 228, 238.)

that Ross filed this lawsuit "as soon as she could"; and (5) instructing the jury that Walsh had taken an adverse employment action against Ross. These errors bolstered Ross's credibility, impeached Lutz's credibility, damaged the reputation of the County and its witnesses, and invaded the province of the jury in determining whether an adverse employment action occurred. Taken together, in a case that turned on witness credibility, the trial court could find if not for the cumulative effect of these errors, it was reasonably likely a different result would have occurred.

Ross contends cumulative prejudice must be more extreme than these "five discrete, inconsequential issues," citing *Bigboy v. County of San Diego* (1984) 154 Cal.App.3d 397, 411–412. There, the appellate court reviewing the trial court's denial of a new trial motion rejected the argument that four instances of purported attorney misconduct constituted cumulative error under *Love v. Wolf* (1964) 226 Cal.App.2d 378. (*Bigboy v. County of San Diego*, at pp. 411–412.) The court concluded there was no comparison between the conduct in its case and that in *Love*, where the court "found 60 instances of flagrant misconduct" which was "intentional, blatant and continuous and was carefully contrived and calculated to inflame the jury." (*Bigboy v. County of San Diego*, at pp. 411–412.)

Here, while the misconduct was not as persistent as that in *Love*, the trial court reasonably could find the errors raised "the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*People v. Hill* (1998) 17 Cal.4th 800, 845.) As we have explained, each incident of misconduct or instructional error had a prejudicial effect on the jury and, when considered together, cast doubt on the credibility of the County and its witnesses, and bolstered Ross's credibility. In this reasonably close case, prejudice is apparent. Accordingly, the trial court did not abuse its discretion when it granted the motion for a new trial based on misconduct and instructional error. Since the trial court did not err in

46.

granting a new trial on this ground, it is not necessary to address whether the trial court erred in granting a new trial on the ground of excessive damages.

## II.     The County's Cross-Appeal

Throughout this case, the County has asserted Ross's lawsuit is barred by the doctrine of laches, arguing the 10-year delay in filing suit since receiving the first DFEH right-to-sue letter was unreasonable and prejudiced the County. The trial court rejected this claim numerous times—it denied the County's summary judgment motion brought on this basis and denied the County's motions for nonsuit and directed verdict during trial. Finally, the County raised the laches defense in its motion for JNOV. In denying the motion, the trial court explained that while it found the County was prejudiced due to the delay, as essential witnesses for the County had died and the memories of all parties were diminished, it was not convinced it could "find the delay to prohibit" the action from proceeding and did not believe it had "the ability" to find laches "under the law."

In its cross-appeal, the County challenges the last ruling, arguing it was erroneous because laches applies to Ross's FEHA claims as a matter of law and the County satisfied the elements of laches.

### A.     *Laches and the Standard of Review*

"Laches is an equitable, affirmative defense which requires a showing of both an unreasonable delay by the plaintiff in bringing suit, ' "plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." ' " (*Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 282.) If, considering the lapse of time and other relevant circumstances, a court concludes a party's failure to assert a right has caused an adverse party prejudice, the court may apply the equitable defense of laches to bar assertion of that right. (*Ibid.*) "The party asserting laches bears the burden of production and proof on each element of the defense." (*Ibid.*) " 'Generally speaking, the existence of laches is

47.

a question of fact to be determined by the trial court in light of all of the applicable circumstances….' " (*Ibid.*)

An appellate court reviews de novo a denial of a motion for JNOV, using the same standard as the trial court. (*Oakland Raiders v. Oakland–Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1194; *Mason v. Lake Dolores Group* (2004) 117 Cal.App.4th 822, 829–830.) JNOV must be granted where, "viewing the evidence in the light most favorable to the party securing the verdict, the evidence compels a verdict for the moving party as a matter of law." (*Oakland Raiders v. Oakland–Alameda County Coliseum, Inc.*, at p. 1194; *Paykar Construction, Inc. v. Spilat Construction Corp.* (2001) 92 Cal.App.4th 488, 493–494; see *Lent v. California Coastal Com.* (2021) 62 Cal.App.5th 812, 837–838 [where trial court refused to apply laches defense, standard of review is whether the evidence compels a finding in the appellant's favor as a matter of law].) Where a motion for JNOV raises legal issues, we review the trial court's ruling "under a de novo standard of review." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) The purpose of a JNOV motion " 'is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation.' " (*Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 743.)

**B.** *Analysis*

Ross filed her initial charge with the EEOC and DFEH on September 29, 2006. On October 2, 2006, the DFEH issued a notice advising Ross and the County the EEOC was responsible for processing the complaint, the DFEH would not be investigating the matter, and the DFEH was "closing its case on the basis of 'processing waived to another agency.' " The DFEH further advised the letter was a right-to-sue notice that allowed Ross to file a lawsuit in state court under the provisions of FEHA within one year of the notice, but the period was tolled during the pendency of the EEOC's investigation of the complaint.

On May 18, 2007, Ross filed a complaint with the EEOC and DFEH; the EEOC sent the County a notice that a charge of discrimination had been filed against it; the attached charge was Ross's September 2006 charge. Ross also filed charges with the EEOC and DFEH on March 23, 2010, and August 29, 2011. The DFEH issued Ross a right-to-sue letter dated August 29, 2011, with respect to the 2011 charge that stated the DFEH was closing its case because the EEOC was responsible for processing the complaint. Finally, the United States Department of Justice (DOJ) issued a letter on July 15, 2016, stating it had been determined it would not file suit on the 2006 charge the EEOC referred to it, the EEOC's conciliation was unsuccessful, and Ross had the right to sue under title VII. Ross filed her complaint against the County the following month.[18]

Ross testified that prior to 2016, she had communications with the EEOC about the progress of her case. She provided information to someone at the EEOC's Fresno office, who gave her some of the County's responses the EEOC received, and she went to the EEOC office to discuss her case. The County submitted a letter to the EEOC in response to the 2006 charge in June 2007 and provided further information to the EEOC in January 2008.

Federal courts have applied the defense of laches in title VII cases brought by private plaintiffs. (*Bernard v. Gulf Oil Co.* (5th Cir. 1979) 596 F.2d 1249, 1256 (*Bernard*).) In *Bernard*, the court rejected the defendant's argument the plaintiffs, who waited nine years after filing charges of discrimination with the EEOC to file suit, could have requested a right-to-sue letter and filed suit earlier, in favor of the plaintiffs'

---

[18] Ross cites to February 2015 EEOC determinations on the 2006 and 2011 complaints in which the EEOC stated it found reasonable cause to believe the County subjected Ross to retaliation and a hostile work environment for opposing discrimination and was constructively discharged, which she submitted in opposition to the County's summary judgment motion. We note that while the clerk's transcript contains the determinations, as well as the EEOC charges and the right-to-sue letters, only the 2006 EEOC charge was admitted into evidence at trial.

argument it was "their asserted right to await the completion of the EEOC administrative process." (*Id.* at pp. 1256–1257.) The court explained the private remedy allowed by 42 United States Code section 2000e-5(f)(1) "is only an alternative method for a plaintiff to obtain relief from discrimination"; therefore, "[a] plaintiff cannot be penalized for choosing to forgo this alternative and electing instead the legislatively and judicially favored method of relying on the administrative processes of the EEOC." (*Bernard*, at p. 1257.) Accordingly, the court held "the plaintiffs' failure to file their [t]itle VII claim until completion of the EEOC process was not inexcusable delay" that would support laches. (*Ibid.*; accord *Holsey v. Armour & Co.* (4th Cir. 1984) 743 F.2d 199, 211; *Howard v. Roadway Express, Inc.* (11th Cir. 1984) 726 F.2d 1529, 1532–1534.)

" 'The conclusion that a delay is "inexcusable" comprehends both the application of a legal standard and an exercise of the trial court's sound discretion in assessing the equitable circumstances of a particular case.' " (*Waddell v. Small Tube Products, Inc.* (3d Cir. 1986) 799 F.2d 69, 77.) While "plaintiffs have some obligation to monitor the progress of their charge and do not have the absolute right to await termination of EEOC proceedings where it would appear to a reasonable person that no administrative resolution will be forthcoming, whether the circumstances warranted the delay in a particular case requires an ad hoc determination." (*Ibid.*) If the elements of laches are met, "a court may dismiss the entire case, dismiss certain claims, or restrict the damages available to the plaintiff." (*EEOC v. Timeless Investments, Inc.* (E.D. Cal. 2010) 734 F.Supp.2d 1035, 1067.)

Ross argues laches does not apply here because under California law, laches is a defense only to equitable, not legal, claims, and in this lawsuit, she is seeking only monetary damages. (See, e.g., *Reid v. City of San Diego* (2018) 24 Cal.App.5th 343, 362 ["laches does not apply as a defense to causes of action seeking money judgments, even where joined with claims in equity"]; *Connolly v. Trabue* (2012) 204 Cal.App.4th 1154, 1164 ["it is well established, both in California and generally, that laches applies to

equitable actions, not actions at law"].)  In contrast, she asserts, in federal actions laches is available as an affirmative defense regardless of whether the lawsuit is at law or in equity.  (See, e.g., *Chirco v. Crosswinds Communities, Inc.* (6th Cir. 2007) 474 F.3d 227, 234.)  Ross urges us not to adopt a federal philosophy that conflicts with longstanding California authority that precludes a laches defense to actions seeking money damages.

The County responds the federal cases applying laches to title VII claims are instructive and we should follow them because California law under the FEHA mirrors federal law under title VII.  (*Godwin v. Hunt Wesson, Inc.* (9th Cir. 1998) 150 F.3d 1217, 1219; *Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 235.)  The County also points out that in *Couveau v. American Airlines, Inc.* (9th Cir. 2000) 218 F.3d 1078, the Ninth Circuit addressed an employer's argument in a summary judgment motion that laches barred the plaintiff's FEHA claims, concluding there were genuine issues of material fact that precluded summary judgment.  (*Couveau*, at pp. 1081 & fn. 2, 1083–1084.)  Finally, the County notes our Supreme Court has concluded laches barred the plaintiff's petition for writ of administrative mandate, filed in conjunction with a complaint that alleged causes of action under FEHA and title VII, which challenged the personnel board and city council actions concerning the plaintiff's dismissal and sought reinstatement, backpay and benefits.  (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 66–69.)

There do not appear to be any California cases that have addressed whether laches is an available defense to FEHA claims seeking money damages.[19]  We need not decide this issue, however, because even if laches may be asserted as a defense in this case, the County failed to satisfy its burden of proving the first element of laches—unreasonable delay.  While Ross could have filed suit on her DFEH claims after receiving the DFEH's

---

[19]    While this court stated in *County of Fresno v. Fair Employment & Housing Com.* (1991) 226 Cal.App.3d 1541, 1556, that laches "bars an equitable remedy" when the plaintiff engages in inexcusable delay, we did not address whether laches may also bar claims that seek only legal remedies.

51.

right-to-sue letters, Ross was awaiting the resolution of her EEOC charges before filing suit. For some reason that is not apparent in the record, it took the EEOC about eight and a half years to complete its investigation and make a determination on Ross's complaints, and another year and a half to engage in conciliation efforts and for the DOJ to decide whether to file suit. Once the DOJ declined to do so, Ross timely filed this action. There is nothing in the trial record to suggest Ross was responsible for the EEOC's delay in processing her EEOC charges. (See *County of Fresno v. Fair Employment and Housing Commission*, *supra*, 226 Cal.App.3d at p. 1556 [declining to find unreasonable delay necessary to support laches where there was no evidence the employees seeking remedies caused the delays; "[d]elays on the part of the [Fair Employment and Housing] Commission and D[FEH] do not give rise to a laches defense"].)

The County contends the delay in filing suit was at least partially attributable to Ross because she could have sued after receiving the DFEH's right-to-sue letters in October 2006 and August 2011, and she acquiesced to the EEOC's unreasonable delay by waiting four years following her 2012 retirement to file suit. We disagree that Ross was required to act on the DFEH right-to-sue letters considering the DFEH notified her the EEOC was conducting the investigation into her charges and closed its case on that basis. In these circumstances, the private remedy afforded Ross under the FEHA was only an alternative method to obtain relief from discrimination and she cannot be penalized for choosing to forgo this alternative and electing instead to rely on the EEOC's administrative processes. (*Bernard*, *supra*, 596 F.2d at p. 1257.) While she could have filed suit after her retirement, given the EEOC's investigation was ongoing, she could continue to await the conclusion of that investigation.

The County failed to produce any evidence at trial showing the EEOC was not actively engaged in the administrative process or that Ross failed to exercise diligence in monitoring the EEOC's progress. While the County asserts "the EEOC's investigation was undoubtedly not 'bearing fruit,' " there is nothing in the trial record to support that

conclusion.[20]  It was the County's burden to show unreasonable delay.  (*Torres v. City of Montebello* (2015) 234 Cal.App.4th 382, 393.)  Based on the evidence presented at trial, we cannot say the trial court was compelled to find unreasonable delay as a matter of law.[21]  Therefore, the trial court did not err in denying the County's motion for JNOV based on laches.

## DISPOSITION

The trial court's orders granting a new trial and denying the County's motion for judgment notwithstanding the verdict are affirmed.  The parties shall bear their own costs on appeal.

                                                                                DE SANTOS, J.

WE CONCUR:


SMITH, ACTING P. J.


SNAUFFER, J.

---

[20]    Ross asserts that she complained to the EEOC about the case dragging on; she told the EEOC she did not understand how a case filed in 2006 was still open and being investigated until 2016.  The EEOC told her if she went to court before it completed its investigation it would not find in her favor, citing to her deposition testimony submitted in the summary judgment motion.  The County asserts Ross's frustration demonstrates she acted unreasonably in waiting for the EEOC process to conclude.  Even if we agree with the County, this evidence was not presented at trial.  On the trial record, we cannot say the trial court was required to find unreasonable delay as a matter of law.

[21]    Since the County failed to prove unreasonable delay, we do not address whether it also proved prejudice.